IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| GARY ENGEL, | ) |
|        Plaintiff, | ) ) ) Case No. 10 C 3288 |
|        v. | ) ) |
| ROBERT BUCHAN, ROBERT QUID, and the VILLAGE OF BUFFALO GROVE | ) ) ) |
|        Defendants. | ) ) |

**COMPLAINT**

NOW COMES Plaintiff, GARY ENGEL, by his attorneys, LOEVY & LOEVY, and for his Complaint against Defendants, ROBERT BUCHAN, ROBERT QUID, and the VILLAGE OF BUFFALO GROVE, states as follows.

**Introduction**

1. This action seeks redress for the Defendants' violations of the United States Constitution and the laws of the State of Illinois, among others.

2. Before his exoneration and release from prison in April of 2010, Plaintiff Gary Engel was incarcerated for more than 19 years for a crime he did not commit.

3. Plaintiff's wrongful conviction was the direct result of intentional misconduct on the part of the Defendants. Plaintiff brings this action seeking redress for the economic, physical, and mental injuries suffered as a result of their malicious scheme.

**Jurisdiction and Venue**

4. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1367.

5. Venue is proper under 28 U.S.C. § 1391. On information and belief, all Defendants reside in this judicial district, and events giving rise to the claims asserted herein occurred within district.

**Parties**

6. Plaintiff, Gary Engel, is a resident of the State of Illinois.

7. On information and belief, Defendant Robert Buchan is a resident of the State of Illinois. At all times relevant hereto, Buchan was an agent of the FBI and a member of Squad 9 of the FBI's Chicago office.

8. On information and belief, Robert Quid is a resident of Florida. At all times relevant hereto, Quid was employed by the Village of Buffalo Grove as a police officer.

9. Defendant Buffalo Grove is a Village in the Northern suburbs of Chicago.

**Background: Steve Manning**

10. Beginning sometime in the mid-1980s, members of Squad 9 of the FBI's Chicago Office undertook a criminal investigation of a former Chicago Police Officer named Steve Manning. Buchan was in charge of the investigation of Mr. Manning.

11. Defendant Quid assisted Buchan in this investigation. It was Quid's belief that Mr. Manning was involved in the murder of Thomas McKillip, who was killed in Buffalo Grove. Accordingly Buchan and Quid worked together to try to prove that Mr. Manning was engaged in criminal wrongdoing.

2

12. Despite a comprehensive investigation, Buchan and Quid were unable to find evidence to corroborate that Mr. Manning had killed Mr. McKillip.

13. Instead, Buchan and Quid put together a case that Mr. Manning had supposedly murdered a man named James Pellegrino.

14. In developing their case against Mr. Manning, the Defendants Buchan and Quid, and others, engaged in intentional misconduct. The linchpin of their case was based on the fabricated testimony of a notorious jailhouse snitch named Tommy Dye, who has subsequently admitted under oath that the investigators fed him critical details about the Pellegrino murder in order to bolster Dye's testimony against Mr. Manning.

15. In addition to framing Mr. Manning for the Pellegrino murder, the Defendants also built a false case that Mr. Manning had supposedly kidnapped two drug dealers in Kansas City, Missouri. The kidnapping had not been contemporaneously reported to the authorities, but it had allegedly occurred on an indeterminate date, about five years prior to the Defendants' investigation.

16. The Defendants, joined by others, improperly manipulated witnesses and withheld exculpatory evidence, all in effort to railroad Mr. Manning.

### Plaintiff Gary Engel

17. During the course of their investigation, the Defendants approached the Plaintiff, Gary Engel, who had been a friend and associate of Mr. Manning, and whose ex-wife had been the sister of Mr. Pellegrino.

3

18. The Defendants informed Plaintiff that they were going to implicate him in the Missouri kidnapping, and that they supposedly had witnesses to corroborate his involvement.

19. Plaintiff has never kidnapped anyone, and had never even been to Missouri in his life. He had absolutely nothing to do with the crime the Defendants were describing to him, and no knowledge thereof.

20. Defendants ignored Plaintiff's protestations of innocence and noninvolvement. On multiple occasions, they informed the Plaintiff that if he was willing to implicate Mr. Manning in the crimes they were investigating, then Plaintiff would be dealt with leniently.

21. Plaintiff continued to insist that he had no knowledge that could assist the Defendants' investigation, because he had nothing to do with any kidnapping in Missouri and had no reason to believe that Mr. Manning was involved either.

### Plaintiff's Wrongful Conviction

22. When Plaintiff refused Defendants' demands that he implicate Mr. Manning, Plaintiff was arrested and charged with the Missouri kidnapping. When Plaintiff continued to refuse Defendants' demands that he provide false evidence against Mr. Manning, he was prosecuted, convicted and sentenced to 90 years of imprisonment.

23. All of the evidence introduced against Plaintiff at his criminal trial was the product of intentional misconduct by the Defendants, who fabricated evidence, manipulated witnesses, and withheld exculpatory evidence.

4

## Mr. Manning's Exoneration

24. Due to the Defendants' violation of his constitutional rights, Mr. Manning, too, was convicted of the Missouri kidnapping, and given a very lengthy prison sentence. Defendants' misconduct also caused Mr. Manning to be wrongfully convicted of the Pellegrino murder, for which he was sentenced to death.

25. In 1998, after Mr. Manning had spent more than a decade behind bars, the Illinois Supreme Court overturned his conviction for the Pellegrino murder. Then, in November of 2002, the Eighth Circuit Court of Appeals overturned Mr. Manning's conviction for the Missouri kidnapping. Neither Illinois nor Missouri elected to re-try Mr. Manning, and he was released.

26. Thereafter, Mr. Manning brought civil rights claims in the Northern District of Illinois against Buchan and Quid, as well as an additional FBI agent.

27. The case against Quid and Buffalo Grove was settled for a confidential sum, without an admission of liability.

28. Mr. Manning's complaint against Buchan (and his partner, Gary Miller), captioned <u>Manning v. Buchan</u>, No. 02 C 372, alleged that the Defendants violated Mr. Manning's constitutional rights by fabricating evidence against him and withholding exculpatory evidence.

29. Mr. Manning's case brought claims against Buchan under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) (hereafter, "<u>Bivens</u>"), for

violating his constitutional rights in connection with two state court criminal prosecutions, as well as against the United States under the Federal Tort Claims Act (hereafter, the "FTCA").

30. Mr. Manning's case was tried before the Hon. Matthew Kennelly over the course of three weeks, beginning in mid-December 2004. In support of his claims that the FBI had framed him, Mr. Manning presented more than two dozen witnesses, and presented thousands of pages of documents.

31. The case was tried simultaneously to a jury and to Judge Kennelly. The jury was called upon to decide the Bivens claims, with the FTCA claims for the judge.

32. On January 24, 2005, the jury returned a verdict in favor of Manning against all defendants on the constitutional claims, awarding $6,406,000 in compensatory damages and $175,000 in punitive damages for the violations of his rights.

33. On November 14, 2005, the district court denied Defendants' post-trial motion challenging the jury's verdict. Manning v. Miller, 2005 WL 3078048 (N.D. Ill. Nov. 14, 2005) ("Manning I").

34. On September 28, 2006, more than eighteen months after the jury's verdict, the district court issued its decision on the FTCA claims to which Buchan was not a party. The court found for the United States on claims different than those supporting the Bivens judgment. Manning v. United States, 2006 WL 3240112 (N.D. Ill. Sept. 28, 2006) ("Manning II").

35. On October 16, 2006, Buchan filed a second Rule 59 motion, arguing that the subsequent adverse finding on the FTCA

6

claims against the United States compelled the court to vacate the prior March 2005 judgment on the jury's verdict against the Defendant Agents. According to Buchan, a provision of FTCA, 28 U.S.C. 2676 required the district court to "bar" the previous judgment on the jury's verdict on the <u>Bivens</u> claim.

36. The district court agreed with Buchan. On December 26, 2006, the court "barred" the judgment on the jury verdict and dismissed the case. <u>Manning v. Miller</u>, 2006 WL 3825043 (N.D. Ill. Dec. 26, 2006) ("<u>Manning III</u>").

37. The Seventh Circuit went on to affirm that decision. <u>Manning v. Miller</u>, 546 F.3d 430 (7th Cir. 2008). Before Mr. Manning, no other litigant in the history of the United States had ever had a judgment entered on a jury verdict on a <u>Bivens</u> claim, only to have it vacated because the judge decided an FTCA claim (a different claim with different elements) adversely. Nor has any other litigant had that happen since.

38. Notwithstanding that Mr. Manning's judgment on the jury's verdict against Buchan was "barred" by operation of the FTCA, that judgment retains preclusive effect for purposes of collateral estoppel. Specifically, where a federal jury has already decided the issue against Buchan after a lengthy trial, he is presently estopped in this and any other litigation from denying that he committed misconduct during the investigation of the Missouri kidnapping.

**Plaintiff's Exoneration**

39. After Mr. Manning won his $6 million judgment against the FBI agents on his claim that they framed him for the

7

Missouri kidnapping, Plaintiff filed a petition for *habeas corpus* based on the evidence of law enforcement misconduct that had been newly-discovered during the Manning trial.

40. On February 23, 2010, the Missouri Supreme Court granted Plaintiff's *habeas* petition and vacated his conviction. The court concluded that material, exculpatory evidence had been withheld from Plaintiff in violation of his constitutional rights. The withheld material included, but was not limited to, previously-undisclosed evidence that the key witness against Plaintiff had received monetary payments in exchange for his testimony.

41. The Missouri Supreme Court gave the State 60 days within which to re-try Plaintiff. Missouri has declined to do so. The claims alleged in this lawsuit are now ripe.

### Legal Claims

42. Plaintiff asserts the following <u>Bivens</u> claims against federal Defendant Buchan, and Section 1983 and state law claims against the remaining Defendants.

43. As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his federal constitutional right to a fair trial.

44. In the manner described above, the Defendants deliberately withheld exculpatory evidence, as well as fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff. Defendants

also engaged in the unduly suggestive identification procedures involving purported eyewitnesses. Absent the totality of this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

45. The Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fifth and Fourteenth Amendment to the United States Constitution.

46. As a result of these violations of his constitutional right to a fair trial, Plaintiff suffered injuries, including, but not limited to, emotional distress.

47. During the constitutional violations described in this Complaint, one or more of the Defendants stood by without intervening to prevent the misconduct. As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

48. All of the Defendants' misconduct also caused Plaintiff to be maliciously prosecuted in a manner actionable under federal law. Defendants caused Plaintiff to be prosecuted without probable cause and the resulting charges were ultimately disposed of in a manner indicative of innocence.

49. Defendant Quid also caused Plaintiff to be maliciously prosecuted in a manner actionable under State law. Defendant Quid caused Plaintiff to be prosecuted without probable

cause and the resulting charges were ultimately disposed of in a manner indicative of innocence.

50. Defendant Quid also intentionally inflicted emotional distress on Plaintiff in a manner actionable under State law. The acts and conduct of Quid set forth above were extreme and outrageous. Quid intended to cause, or was in reckless disregard of the probability that his conduct would cause, severe emotional distress to Plaintiff, which it did.

51. As described more fully in the preceding paragraphs, Defendant Quid, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means in a manner actionable under State law. In furtherance of said conspiracy, Defendant Quid committed overt acts and were otherwise willful participants in joint activity.

52. In committing the acts alleged in the preceding paragraphs, Defendant Quid was a members of, and agent of, the Buffalo Grove Police Department, acting at all relevant times within the scope of employment and under color of law. Defendant Buffalo Grove is liable as principal for all of the torts committed by its agents.

53. The misconduct described in this Count was also undertaken by Quid and other Buffalo Grove agents, all of whom acted pursuant to the policy and practice of the Buffalo Grove Police Department to pursue wrongful convictions through profoundly flawed investigations and witness identification procedures, as well as to withhold exculpatory information

bearing on the crime at issue. The Village of Buffalo Grove violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

54. In addition to constituting policies, these widespread practices, so well-settled as to constitute *de facto* policy in the Buffalo Grove Police Department, were able to exist and thrive because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, at least some of the misconduct alleged in this Complaint was undertaken by policy-makers with final policymaking authority for the actions at issue.

55. Additionally, over the course of years, each of the individual Defendants have, and continue to, conduct racketeering activity through their positions as agents of the Federal Bureau of Investigation and other law enforcement agencies in a manner that has caused harm to Plaintiff's business and property.

56. Specifically, these Defendants have associated with an enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. Each individual Defendant played some part in directing those affairs.

57. The racketeering activity referred to in the preceding paragraphs satisfies the conduct requirement in that it includes the provision of false documents and the false testimony

11

of others to the various State's Attorneys' Offices, who then used this information to prosecute Plaintiff. In so doing, Defendants directed the criminal investigation against Plaintiff in their official positions with the Federal Bureau of Investigation and the Buffalo Grove Police Department.

58. The FBI and the Buffalo Grove Police Departments are enterprises, as defined under 18 U.S.C. § 1961, which is engaged in and affects interstate commerce.

59. The racketeering activity referred to in the preceding paragraphs includes, at a minimum, at least two predicate acts with the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

60. The predicate acts referred to in the preceding paragraphs include, among others, the Defendants' actions in framing Plaintiff for the Missouri kidnapping, attempting to coerce him to testify falsely against his co-Defendant, and the attempts to frame his co-Defendant for the Pellegrino murder in the manner described more fully above. This includes but is not limited to using their official positions to obstruct state and local criminal investigations, influence a grand jury, commit perjury, tamper with witnesses (including the inducement of witnesses to give false statements and commit perjury), and otherwise cover up their misconduct in working to obstruct justice and procure convictions of Plaintiff for crimes he did not commit.

61. RICO's continuity element is satisfied here in the manner described above in that Defendants engaged in a series of related attempts to frame Plaintiff over a substantial period of time (close-ended continuity) and because the Defendants' misconduct, by its nature, projects into the future with a threat of repetition (open-ended continuity).

62. The individual Defendants have engaged in a long-standing pattern of racketeering activity that continues to this day. The acts comprising this racketeering activity are related to each other and pose a threat of continued criminal activity, as demonstrated, *inter alia,* by the repeated nature of the attempts to incriminate Plaintiff (as well as Mr. Manning) falsely, and by the law enforcement authorities' continuing failure to cooperate with federal officials seeking to bring to justice the person(s) actually responsible for the crimes with which Plaintiff was wrongfully charged.

63. As a result of Defendants' conduct, Plaintiff has suffered injuries to his business and/or property. Specifically, Plaintiff was forced to hire an attorney and to pay legal fees, suffered a loss of business reputation and damage to his then-existing business opportunities, lost bond money, as well as interest and fees on that bond money, all as a direct and proximate result of Defendants' racketeering activity.

64. Each of the individual Defendants in this action conspired and agreed, impliedly or directly, to participate in framing Plaintiff for crimes he did not commit. These Defendants conspired and agreed, impliedly or directly, that some of them

would commit a pattern of racketeering activity in order to harm Plaintiff, and then took actions in furtherance of that common objective.

65. As a result of Defendants' conduct, Plaintiff has suffered injuries to his business and/or property. Specifically, Plaintiff has had to pay legal fees, suffered a loss of business reputation, and lost bond money, as well as interest and fees on that bond money, as a direct and proximate result of Defendants' racketeering activity.

WHEREFORE, Plaintiff, GARY W. ENGEL, respectfully requests that the Court enter judgment in this favor and against Defendants ROBERT BUCHAN, ROBERT QUID, and the VILLAGE OF BUFFALO GROVE, awarding treble compensatory damages against all of the defendants, and punitive damages against the individual defendants, as well as costs, attorneys fees against all Defendants, along with any other relief this Court deems just and appropriate under the circumstances.

RESPECTFULLY SUBMITTED,

_____
Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Michael Kanovitz
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
(312) 243-5900

## Jury Demand

Plaintiff hereby demands trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

_____
Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Michael Kanovitz
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

15