IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL ENGEL, as personal      )
representative of the Estate   )
of GARY ENGEL, deceased,       )
                               )
         Plaintiff,            )
                               )
    v.                         )      No. 10 C 3288
                               )
ROBERT BUCHAN, et al.,         )
                               )
         Defendants.           )

**MEMORANDUM OPINION AND ORDER**

Gary Engel ("Engel") has sued former FBI Agent Robert Buchan

("Buchan") and the United States ("Government")(collectively

"Federal Defendants") as well as former Village of Buffalo Grove

police officers Robert Quid ("Quid") and Gary Del Re ("Del Re"),

charging each of them with violations of state and federal law

following Engel's release in 2010 after 19 years of

incarceration.[1]  More precisely, Engel claims that all three

individual defendants are liable under both the seminal <u>Bivens</u>

decision and 42 U.S.C. §1983 ("Section 1983") for fabricating

evidence of his guilt, for inducing false testimony by witnesses

and for then failing to disclose that evidence in violation of

<u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Newsome v. McCabe</u>, 256

F.3d 747 (7th Cir. 2001).  Engel also maintains related claims

---

[1] Engel is now deceased, so that (as the caption reflects)
the case is being carried on by his son (and personal
representative of his estate) Daniel Engel.  This opinion will,
however, refer to Engel himself throughout.

that the individual defendants failed to intervene to prevent the violations of his due process rights and engaged in civil conspiracy to violate those rights. Finally Engel charges Quid and Del Re, and the United States via the Federal Tort Claims Act, with malicious prosecution under Missouri state law.

After the litigants had spent some time slugging it out on the discovery front, followed by a bizarre set of unrelated events that culminated in Engel's suicide, they have now brought Fed. R. Civ. P. ("Rule") 56 cross-motions for summary judgment.[2] While the case includes a number of legal twists and turns, the ultimate result is best captured by our Court of Appeals' teaching in Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003):

> Where the parties present two vastly different stories--as they do here--it is almost certain that there are genuine issues of material fact in dispute.

In that respect even a brief glance at the parties' LR 56.1 statements of fact is itself instructive, for each side contests all but the most basic of facts offered by its opponent. That fundamental clash in the parties' narratives compels this Court to deny all of the motions for the reasons described below.

---

[2] As n.10 reflects, "summary judgment" is really an inappropriate label for the relief that the parties seek. But as the same note says regarding other terminology employed by all counsel, it would require too much effort to recast this extraordinarily lengthy opinion to fit this Court's mold, and it would make no substantive difference if that were done, so that this Court simply adheres to the parties' usage.

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgments (Payne, 337 F.3d at 770). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v.

---

[3] Both sides have complied with this District Court's LR 56.1, adopted to implement Rule 56. This opinion cites to Engel's LR 56.1(a)(3) statement as "E. St. ¶--," to Buchan's corresponding statement as "B. St. ¶--" and to the Government's statement as "U.S. St. ¶--." All responses to statements of fact take the form "x R. y St. ¶--," with the "x" denoting the author of the response and "y" denoting the party to whose statement "x" has responded. LR 56.1(b)(3)(B) statements of additional facts are cited as "Add. St. ¶--." Abbreviations "E." for "Engel," "B." for "Buchan," "Q." for "Quid" and "U.S." for the Government are used throughout. Finally, the parties' exhibits are cited "Ex.," their memoranda are cited "Mem." and their responsive memoranda are cited "R. Mem."

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

As with any summary judgment motion, this Court accepts each nonmovant's version of any disputed facts, but only so long as it is supported by record evidence. Where as here cross-motions for summary judgment are involved, the principles of Rule 56 demand a dual perspective that this Court has sometimes described as Janus-like: As to each motion the nonmovant's version of any disputed facts must be credited, an arrangement that sometimes causes the denial of both motions.

That has unfortunately proved to be the case here, for each party has shown that genuine issues of material fact remain that must be addressed before the claims may be resolved. In any case, what follows is a summary of the facts, with material disagreements between the parties' narratives noted where appropriate. That factual "summary" is a good deal longer than this Court would have preferred, but that length has been compelled by the proliferation of cross-motions for summary judgment and the consequent need to identify contested material facts.

**Facts**

This case concerns two former police officers, friends and occasional criminal associates, Steve Manning ("Manning") and Engel, who were separately tried and convicted of kidnapping and ransoming a major drug dealer. They were convicted largely

through the efforts of Buchan and Quid, and the conviction relied heavily on the testimony of Anthony Mammolito ("Mammolito").

Both Engel and Manning were released from prison after successfully seeking habeas corpus review, and each separately brought suit against federal and state law enforcement officers and the United States. For his part, Manning succeeded in convincing a jury that officers had violated his constitutional rights by fabricating evidence and withholding <u>Brady</u> material from prosecutors, but that favorable verdict was vacated after this Court's colleague Honorable Matthew Kennelly found against Manning on his state law claims. Engel now tries his hand where Manning ultimately failed.

<u>Buchan's and Quid's Investigation</u>

Engel's saga is best understood by starting with that of Manning, a former Chicago Police Officer who had lost his job after either a conviction for or investigation into his criminal behavior (compare E. St. ¶5 with B. R. E. St. ¶5), then served for several years as an FBI informant (E. St. ¶5). In that role Manning would report on the activities of Thomas McKillip ("McKillip") (E. St. ¶6), who was murdered in 1986, after which Buchan attempted to terminate Manning's involvement with the FBI (<u>id</u>. at ¶7).

In 1989 the FBI opened an investigation into Manning under the Interstate Transportation of Stolen Property Top Thief Target

(B. St. ¶6).  That investigation was assigned to Buchan, who
pursued it on multiple fronts, attempting to link Manning to
burglaries, drug dealing and murders (E. St. ¶10).

Those investigative efforts did not bear significant fruit
until Buchan visited then Buffalo Grove Police Officers Quid and
Del Re, who were investigating the McKillip murder.  Although
Quid and Del Re had previously exhausted all of the available
leads in the McKillip investigation (E. St. ¶11), the pair
traveled on August 12, 1989 to visit Mammolito in a federal
prison in Louisiana (E. St. ¶12). Mammolito (a former Manning
associate) resented Manning and considered him responsible for
his own conviction (E. Add. St. ¶14).

Mammolito was unable to provide concrete evidence regarding
the McKillip murder, so Quid asked Mammolito whether he knew of
any other crimes involving Manning that could be investigated (E.
St. ¶15).  In an effort to induce Mammolito to share information,
Quid and Del Re showed Mammolito multiple photographs of murder
victims, including one of a man with his hands and head chopped
off--actions that they attributed to Manning.

After that prodding Mammolito offered the investigators a
lead, telling Quid and Del Re that he, Engel, McKillip and
Manning had participated in the kidnapping of drug dealer Charles
Ford ("Ford") in Kansas City, Missouri.  According to Mammolito,
Manning and Engel had posed as DEA agents, handcuffed and

blindfolded Ford and an associate, and brought the victims to a safe house (B. St. ¶7). Mammolito claimed that the group convinced one of Ford's family members to pay a ransom, which Mammolito and McKillip drove to pick up (E. Add.St. ¶20). That last detail differs from Mammolito's testimony at trial, where he stated that he and Manning (rather than he and McKillip) had gone to pick up the ransom.

As part of their dispute on many issues of fact involving Mammolito, the parties disagree on both the tenor and content of that meeting. First (based on seemingly conflicting statements in Mammolito's deposition) the two sides argue over whether Mammolito claimed to have knowledge of the McKillip murder (B. R.E. Add. St. ¶15). They also dispute whether or not Quid asked Mammolito if he "knew anything to help us get this guy off the streets" (id. ¶18) and whether or not Mammolito initially refused to testify at any trial that might result from his tips (id. ¶21). Their disagreements extend to whether Quid's report of the interview is in general an accurate representation of the meeting or omits key details mentioned by Mammolito in his deposition (compare B. St. ¶10 with E. Add. St. ¶25).

In addition, the parties differ as to the extent of Buchan's involvement with Mammolito. They agree that during that period Buchan had no actual contact with Mammolito: Mammolito strongly disliked the FBI, which he claimed had framed him (E. R.B. St.

¶9), and he therefore refused to work directly with the Bureau. Buchan insists--relying largely on his own testimony at trial--that he did not talk to Mammolito "through" Quid or guide Quid's discussions with Mammolito.  Because of Mammolito's antipathy toward the FBI, he assertedly refused to deal with federal agents and was handled "exclusively" by the Buffalo Grove people (B. St. ¶8).

On the other hand, Engel points to statements by Buchan and others that suggest the outsized contributions of Buchan to the investigation, and Engel insists that Buchan was actively working with Quid "hand in hand every step of the way." (id.; E. Add. St. ¶¶95-99).  Engel also emphasizes Buchan's 1990 performance review, which credits Buchan with "self-develop[ing] leads" surrounding the Missouri kidnapping (id ¶10).

Shortly after the first Mammolito interview, in November 1989 Buchan and Quid interviewed Ford, the alleged kidnapping victim (B. St. ¶13). Ford--who at the time of the kidnapping was "probably" the biggest cocaine dealer in the Kansas City area--had not reported the kidnapping when it assertedly occurred.  At the time of his initial conversation with Buchan and Quid, he had just been released from prison on unrelated charges (E. Add. St. ¶¶30-33).  Their meeting was arranged by Ford's probation officer, who asked Ford whether he had any objections to going to meet the Chicago officers in Miami (id.

¶35). Ford felt it would be in his best interest to attend (although he denies that his probation officer had leverage over him) and chose to meet Buchan and Quid.

At the meeting Ford confirmed that he had been kidnapped in 1983 or 1984, though he believed a rival drug dealer had been responsible for the kidnapping (id. ¶38). It is unclear precisely when the kidnapping occurred--Ford had not previously reported the incident to law enforcement, and in later statements he offered two different timelines for the event (one in December 1983 and one in February 1984).[4] Ford explained that two individuals approached him and an associate, identified themselves as DEA agents, told them they were under arrest, handcuffed them and placed tape over their eyes (B. St. ¶14). Because Ford never saw his assailants' faces, he could not identify them.

Ford also told the investigators that his kidnappers stole his ring, which he described (according to Quid's report) as gold with six diamonds on a top surface (id. ¶15), while according to Buchan's report the ring was described as having five diamonds (E. Add. St. ¶40). Investigators Quid and Del Re then sought to find evidence proving that it was Engel and Manning who had committed the kidnapping and taken possession of Ford's ring.

---

[4] According to Engel, Ford abandoned the earlier date after being told by the investigators that it "would not work" (id. ¶¶40-42).

As part of that effort Quid interviewed Engel's ex-wife Sharon Dugan ("Dugan").  There was no love lost between the divorced duo--at the outset of the meeting Dugan explained that she had court charges pending against Engel for harassment, that he had made threats against her and that they were not on speaking terms (E. Add. St. ¶46).  Quid brought up the Missouri kidnapping and asked whether Dugan had any knowledge of Engel's possible involvement (E. Add. St. ¶48).  According to Quid's report, Dugan replied that Engel had bragged about extorting money from drug dealers while posing as a DEA agent (B. St. ¶18).  There is a dispute as to what happened next:  Engel says that Quid raised the issue of Ford's ring and showed Dugan a sketch of the ring (E. Add. St. ¶50), while Buchan says that Quid discussed the ring only after Dugan told him that Engel possessed stolen jewelry (B. R.E. Add. St. ¶50).  In any case, Dugan told Quid that she believed she had seen Ford's ring after Engel's return from a trip to Missouri, and in fact she had previously taken and hidden that ring. She promised to provide it to the investigators at a later date.

In the following week Dugan met again with Quid, with Buchan also in attendance for the first time.  At that meeting Dugan gave the investigators the ring that she claimed to have taken from Engel earlier.  That ring contained seven diamonds rather than the six-diamond configuration mentioned by Ford or the five

diamonds described in Buchan's report (E. Add. St. ¶51).  At that
meeting Dugan assertedly mentioned for the first time Manning's
involvement in the kidnapping, something she had not referred to
in the first interview.[5]

Buchan and Quid then met again with Ford, who identified the
ring as looking like the one that had been taken from him.[6]  The
investigators also interviewed Mark Harris, the second kidnapping
victim, who confirmed Ford's general account of the
kidnapping--though he, like Ford, was unable to provide any
insight into the identity of the kidnappers (B. St. ¶29-31).

Having determined Engel's claimed involvement to their own
satisfaction, Quid and Buchan met with Engel.  According to Engel
they sought to use his alleged involvement in the kidnapping as
leverage to induce him to implicate Manning (see E. Add. St.
¶¶64-65).  Engel denied any involvement in the kidnapping, stated
that he had met Mammolito only once and claimed he had never been
to Missouri in his life (id. ¶66).  In addition the investigators
showed Engel a report of their interview with Mammolito--a tactic
that Engel suggests was intended to persuade him to adopt

_____

[5]  It is worth noting that Dugan's recall of those
interviews is limited at best.  At her deposition she claimed to
remember almost nothing of what she did or did not tell the
investigators (see E. Add. St. ¶53)).

[6]  Here the parties dispute whether Ford positively
identified the ring at first or merely stated that the ring
"looked like" the one that he had lost.

Mammolito's story (id. ¶67).  Engel asserts that Buchan and Quid pressured him to come up with anything to incriminate Manning, whether truthful or not (an assertion that Buchan contests vigorously)(B. R.E. Add. St. ¶68).

Next Buchan and Quid turned to Carolyn Heldenbrand ("Heldenbrand"), who had paid the kidnapping ransom (id. ¶69).  Heldenbrand had seen the man who picked up the ransom, though she had viewed him only for a "few seconds" six years earlier (id. ¶72).  Buchan conducted a photo lineup to allow Heldenbrand to identify the kidnappers.  Although the lineup included pictures of Engel and Manning, it omitted photographs of McKillip or Mammolito, even though Mammolito had initially stated that it was he and McKillip who had picked up the ransom, rather than Manning or Engel (id. 71).

Buchan began by showing Heldenbrand a lineup that included a photograph of Engel, but she was unable to identify anyone.  Buchan then provided a six-photo spread that included Manning (though Engel claims that the lighting and framing of Manning's photo differed significantly from the other photos in the array).  Heldenbrand said that Manning's photo "look[ed] similar" to the man who had picked up the ransom.  Buchan then laid down another four photos, one of which was a second photo of Manning.  According to Buchan, at that point Heldenbrand stated without hesitation that the second Manning photo "appear[ed] identical"

to the person who picked up the ransom (id. ¶¶73-77). Although FBI policy generally discourages such multiple displays of a suspect's photograph in a lineup, it does permit such displays if they are in furtherance of a legitimate law enforcement purpose (here Buchan claims, as such purposes, (1) the difficulty in finding a photo of Manning from the relevant time period and (2) the fact that Buchan was already in Minnesota for the interview and could not easily revise his lineup procedure).

Following Heldenbrand's identification, Mammolito changed his story to state that Manning had been the conspirator sent to pick up the ransom money (E. Add. St. ¶85). That revised account meshed conveniently with Heldenbrand's identification of Manning and in that way aided the investigators' efforts to convict Manning. Engel also emphasizes that the report documenting that reversal, which he appears to suggest occurred at the second Mammolito interview, is missing (id.).[7] At that second interview the investigators pressured Mammolito to testify, informing him that he was essential to the case (Q. Ex. GG, at 29-33).

In building their case, the investigators also conducted a search of the residence of Engel's then girlfriend, with whom he

---

[7] It is clear from the record that the report of the second interview with Mammolito is indeed the only missing interview report. It is less obvious whether that is when Mammolito's change of story occurred, though Quid admits that at that interview he informed Mammolito that other witnesses disagreed with Mammolito's account (E. Ex. 23 at 43-44).

was staying.  There they found handcuffs, a badge, blank Cook County search warrants, a bugging device and a book entitled "How to Rip Off a Drug Dealer" (B. St. ¶44).

Criminal Trials

Having completed the investigation, Buchan asked the Clay County, Missouri prosecutors if they would be willing to prosecute Manning and Engel for the kidnapping.  With the FBI already having developed the "vast majority" of the evidence used to prosecute the kidnapping, Clay County agreed to prosecute Manning so long as the FBI footed the bill (E. Add. St. ¶95-98).

Manning and Engel were tried separately.  Accordingly their travels through the criminal justice system will also be dealt with here separately.

Manning's first trial ended in a jury deadlock, after which Quid, Buchan and the Clay County prosecutors met to critique the trial and brainstorm about what steps to take to win the retrial (id. ¶101).  Manning was convicted at his second trial, after which the prosecutor in the case noted that "Bob Buchan literally dedicated two years of his career to convicting Mr. Manning" (id. ¶102).[8]

As for Engel, before going forward with his case Clay County

_____

[8]  Manning was later convicted of an Illinois murder, a conviction that Manning also successfully attributed to misconduct by Buchan (see Manning v. Miller, 2005 WL 3078048 (Nov. 14)).

14

prosecutor Rex Gabbert ("Gabbert") instructed Kansas City police to re-interview witnesses. Based on information provided by Buchan, Quid and Del Re, as well as those re-interviews, the Clay County prosecutor's office made its determination that there was probable cause to charge Engel (B. R.E. Add. St. ¶104). Gabbert (along with Assistant Prosecuting Attorney Klopfenstein) was assigned to the prosecution (B. St. ¶45).

On July 26, 1990 Engel was arrested (E. Add. St. ¶94).[9] He was charged with two counts of criminal action for his participation in the Missouri kidnapping. At a preliminary hearing in which the state judge found probable cause, Ford, Mark Harris and Dugan testified (B. Ex. 71).

Engel was tried in June 1991 (see <u>Missouri v. Engel</u>, No. 190-1698), and he was sentenced to 90 years in prison.

<u>Mammolito Agreement</u>

All the parties have spilled much ink debating the existence or nonexistence of an agreement to pay Mammolito for his testimony. Here are the relevant facts bearing on that subject.

On July 15, 1990 Mammolito sent Del Re a letter (with no copy to Buchan) stating that he would cooperate with the kidnapping prosecution in return for a grant of immunity (B. St.

---

[9] Soon after Engel's arrest, Buchan and Engel spoke by phone. As Engel would have it, Buchan phoned him to try to pressure him into testifying against Manning, which in Buchan's account Engel initiated contact and offered to testify (B. R.E. Add. St. ¶94).

¶48). That letter also expresses a desire for certain minor prison benefits, such as use of the telephone and visiting privileges (id. at ¶49). Mammolito's letter noted that he would speak to the prosecutor about working out details of that arrangement, and it does not mention monetary compensation.

Hard evidence of an agreement to pay Mammolito first surfaced approximately a year after trial. Mammolito says he sent a letter to Gabbert on April 14, 1991 (the "Gabbert Letter"), referring to an agreement he claims to have reached before trial and asking for Gabbert to send $850 to Mammolito's mother (B. St. ¶59). Gabbert claims never to have received that letter.

Mammolito sent his second request for payment a year later. In a letter addressed to Quid dated February 7, 1992 ("Quid Letter"), Mammolito referred to an agreement he said had been reached before Engel's trial (E. Add. St. ¶124):

> Well Bob I would like to take this opportunity to remind you of the agreement that we made in March of 1990, that you made with no reservations....[T]hat was your department or some, department, would reimburse me for my expenses that I incurred...for a total of $1,700.

Mammolito also testified to the existence of an agreement in his deposition, though he seemed unsure as to whether the agreement was with Quid and Del Re or with prosecutors.

On November 9, 1992 Buffalo Grove sent a $500 check to Mammolito's mother, accompanied by a letter from Del Re in which

he apologized for the delay in payment and stated that he wished he could have sent more (E. Add. St. ¶126). Del Re also thanked Mammolito for "the help [he] provided in this very important case" (id.).

Any earlier agreement to compensate Mammolito monetarily, if it existed, was not disclosed to Engel or his trial counsel. Del Re has admitted to paying Mammolito and conceded that he did not personally inform the prosecutor of the payment, but he denied that he had reached any monetary agreement with Mammolito before the trial was over (E. Ex. 32). Instead he asserts that the money was used to compensate Mammolito for his time and expenses and was a sort of "thank-you" for his efforts.

As to the vital question of whether or not prosecutor Gabbert knew of any agreement for payment, the litigants differ sharply. Buchan and Quid note that Mammolito repeatedly suggested in his letters and deposition that his deal may have been with the prosecutors rather than the investigators (B. St. ¶¶48-50). Furthermore, the Gabbert Letter was marked "received by the Clay County Prosecutor's Office," and one prosecutor testified that the letter was "in the prosecutor's file" at a later date (B. St. ¶60).

But Gabbert has consistently denied knowledge of any agreement to pay Mammolito in connection with his testimony, and he has stated that if he had known of the letter he would have

notified defense counsel as well as refused to authorize payment
(E. Add. St. ¶130).  Gabbert has flatly denied ever seeing the
Gabbert Letter, stating that "I never saw this letter. I never
had this document" (id. 132).  And Engel's defense counsel also
testified that when he examined the prosecutors' file in May 1991
the Gabbert Letter was not in the file (id. 133).

Exoneration and Civil Trials

Manning's murder conviction was vacated on appeal by the
Illinois Supreme Court due to improper admission of evidence
(People v. Manning, 182 Ill.2d 193, 695 N.E.2d 423 (1998)), and
Cook County authorities declined to retry the case.  Several
years later his Missouri kidnapping conviction was vacated by the
Eighth Circuit on habeas corpus review (Manning v. Bowersox, 310
F.3d 571 (8th Cir. 2002)).

As stated early in the Facts section, Manning filed a civil
rights action remarkably similar to the case at bar, eventually
including as defendants Buchan, another federal agent and the
United States. Judge Kennelly combined a jury trial on Manning's
Bivens claim with a bench trial on his FTCA claims.  As for the
first of those, the jury found against Buchan on the Bivens claim
stemming from the Missouri prosecution, and it found against both
Buchan and Miller on the Bivens claim arising from the Illinois
prosecution.  Manning was awarded over $6.5 million in combined
damages--a verdict that the district court upheld against a

motion for judgment as a matter of law (<u>Manning v. Miller</u>, 2005 WL 3078048 (N.D. Ill. Nov. 14)).  In its verdict the jury made specific findings that one or both of the agents fabricated or caused to be fabricated material evidence and concealed that evidence from Manning and the prosecutors who handled the kidnapping case (<u>Manning v. Miller</u>, 546 F.3d 430, 432 (7th Cir. 2008)).  Meanwhile the FTCA claims remained under advisement.

Approximately six months later, on Manning's motion the district court reopened the FTCA claims.  Judge Kennelly found in favor of the United States on those claims, determining that probable cause existed for the prosecution, but he emphasized that his findings did not call into question the validity of the jury's <u>Bivens</u> verdict, and he noted that he was convinced that Buchan and Miller had "exceeded their proper roles as investigators" (<u>Manning v. United States</u>, 2006 WL 3240112, at *1 (N.D. Ill. Sept. 28)). Following that ruling Buchan and Miller moved to vacate the judgment against them under the FTCA's "judgment bar" (28 U.S.C. §2676), a provision that specifies that an FTCA judgment bars any action by a plaintiff by reason of the same subject matter.  Judge Kennelly granted the motion and vacated the <u>Bivens</u> judgment, and our Court of Appeals affirmed (<u>Manning v. United States</u>, 546 F.3d 430 (7th Cir. 2008)).

In February 2010 the Missouri Supreme Court granted Engel habeas corpus relief, reversing his conviction (<u>State ex rel.</u>

Engel v. Dormire, 304 S.W.3d 120 (Mo. 2010)(en banc)).  Its

opinion held that the prosecution had failed to meet its Brady

obligations by not turning over the Mammolito impeachment

evidence, and it provided Missouri 60 days in which to retry

Engel before releasing him–an opportunity the state declined to

pursue.  After his release Engel commenced these proceedings.

With that lengthy prelude to serve as a backdrop, this

opinion turns to an analysis of the parties' cross-motions.  With

no sequence of treatment seeming more logical than any other, the

discussion will begin with Engel's motion, then turn to those of

defendants.

## Engel's Motion for Partial Summary Judgment

### Collateral Estoppel (Issue Preclusion)

Engel first moves for what he calls partial summary judgment

on his Bivens claim against Buchan, basing that motion upon an

assertion of what he terms "collateral estoppel."[10]  Because the

jury in the Manning litigation found that Buchan "induced Anthony

Mammolito, Carolyn Heldenbrand, and Sharon Dugan to make false

---

[10]  At the risk of being viewed as overly picky, this Court
employs Engel's vocabulary as to the concepts in the text
sentence with some reluctance.  What he really seeks is not a
judgment, but rather a narrowing of issues (a matter for Rule 16
rather than Rule 56 treatment).  And this Court has always
favored the terminology of collateral estopped and res judicata
(particularly because the latter term has often been used to
cover both issue and claim preclusion--see, e.g., Justice
Blackmun's n.1 in Migra v. Warren City School Dist. Bd. of Educ.,
465 U.S. 75 (1984).  But as n.2 to this opinion says, recasting
the terminology here would be a game not worth the candle.

statements or fabricate claims about the kidnapping and concealed

that information from prosecutors, and...concealed from

prosecutors that a promise had been made to pay money to

Mammolito" (<u>Manning v. Miller</u>, 2005 WL 3078048, at *5 (N.D. Ill.

Nov. 14)), Engel argues that Buchan should be precluded from

relitigating those issues, so that Engel would prevail on his

constitutional due process claim.  For as <u>Newsome</u>, 256 F.3d at

752 teaches, a defendant "did not receive a fair trial if the

prosecutors withheld material exculpatory details" and thus such

a defendant would have "a due process claim in the original sense

of that phrase."

   <u>Ross-Berger Cos. v. Equitable Life Assurance Soc'y of the</u>

<u>U.S.</u>, 872 F.2d 1331, 1334 (7th Cir. 1989) has quoted the teaching

of <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 331 (1979)

(alterations in original)) that "trial courts [have] broad

discretion to determine when [offensive collateral estoppel]

should be applied."  That doctrine may be invoked only when four

conditions are met (<u>Adair v. Sherman</u>, 230 F.3d 890, 893 (7th Cir.

2000)):

> (1) the issue sought to be precluded is the same as that
> involved in a prior action; (2) the issue was actually
> litigated; (3) the determination of the issue was essential
> to the final judgment; and (4) the party against whom
> estoppel is invoked was represented in the prior action.

Buchan concedes that Engel has satisfied the final factor, but he

disputes whether the first three conditions have been met.

Buchan first argues that the issue in this action is not the same as the issue in Manning. Instead he urges that this case presents for the first time the question whether an investigator has a clearly established duty to disclose Brady evidence when the prosecutor is already in possession of that evidence (B. R. to May 8, 2013 Minute Order, at 6). Buchan frames the question as one of entitlement to qualified immunity, and he states that because that ground is different from the grounds he had relied upon in the Manning litigation, preclusion is inappropriate.

That is dead wrong. Whether Buchan and Quid withheld information from the prosecutor was at the heart of the Manning litigation, and the jury there found that Buchan had concealed the existence of the agreement with Mammolito from both prosecutors and defense counsel. Moreover, as Engel rightly concedes, this "new" legal issue that Buchan raises is not even in dispute: If Buchan and Quid withheld nothing from the prosecutor, they are not liable for the due process violation (E. R. Mem. 4). Both in Manning and in this litigation, the issue is whether Buchan did in fact withhold information. In Manning the jury found that one or both of the FBI agents fabricated or caused to be fabricated material evidence and concealed that evidence from the prosecutors who handled the case (Manning v. United States, 546 F.3d at 432), and Buchan is not now entitled to distinguish that once-resolved factual dispute as a new legal

issue.

Next Buchan contends that the issues were not actually litigated because he did not have an opportunity to appeal the Manning jury's verdict. Courts will not apply collateral estoppel against a party who did not have a "full and fair opportunity to litigate" the relevant issue, and a "full and fair opportunity to litigate includes the right to appeal an adverse decision" (Gray v. Lacke, 885 F.2d 399, 406 (7th Cir. 1989)). According to Buchan he lacked that opportunity because Judge Kennelly vacated the jury verdict before Buchan's appeal to our Court of Appeals was resolved (while Buchan did address the jury verdict in his brief to that court, it declined to rule on the merits of the jury verdict after affirming the district court's application of the FTCA bar--see Manning v. United States, 546 F.3d at 438). That being so, Gray, 885 F.2d at 406 makes it clear that collateral estoppel should not be applied:

> [A]lthough the district court decided those issues against her in her prior suit, our court expressly declined to reach those issues on appeal. Thus, under these circumstances, she contends that collateral estoppel is inappropriate. We agree.

Engel attempts to escape the force of that holding by arguing that Buchan's time to appeal the jury verdict had already expired when he actually filed his appeal. Because Buchan's appeal was not timely, Engel contends, he cannot now complain that he was denied a full and fair opportunity to litigate the

jury verdict.  Resolving that disagreement requires a close look at the procedural timeline:  On March 25, 2005 Judge Kennelly entered judgment for Manning on the _Bivens_ claim; on November 14, 2005 he denied Buchan's first motion that the latter labeled as having been brought under Rule 59; on September 28, 2006 (nearly a year later) he entered judgment on the FTCA claims; on October 16, 2006 Buchan filed another asserted Rule 59 motion, this time seeking to vacate the judgment in accordance with the FTCA's judgment bar; on December 26, 2006 Judge Kennelly granted that motion and vacated the _Bivens_ judgment; on January 16, 2007 Manning appealed the vacature; and on February 20, 2007 Buchan filed his notice of cross-appeal, which raised the issue of the sufficiency of the evidence in the jury's _Bivens_ verdict.

Engel contends that the _Bivens_ judgment survived (and therefore became an appropriate subject of collateral estoppel) because Buchan's time to appeal that judgment had expired either (1) during the nearly year-long gap between the jury verdict and the FTCA verdict or (2) 60 days after the entry of the FTCA verdict.  In the first scenario, Buchan would have missed the appeal deadline by more than a year.  In the second, he would have missed it by more than a month.

That first scenario is a non-starter.  No Rule 54(b) determination was made after the entry of the _Bivens_ claim, even though the jury verdict had adjudicated fewer than all of the

claims of all the parties.  Thus the <u>Bivens</u> determination did not
constitute a final judgment that rendered the jury verdict final
and appealable (<u>Principal Mut. Life Ins. Co. v. Cincinnati TV 64
Ltd. P'ships</u>, 845 F.2d 674, 676 (7th Cir. 1988)).  Although Engel
points out that Buchan did not "seek a Rule 54(b) finding,
despite the opportunity to have done so" (E. R. 65), litigants
have no obligation to request a Rule 54(b) determination, and
without such a determination the judgment was not final.  Because
an appeal did not yet lie at that point, Buchan cannot be held
responsible for failing to appeal before the entry of the FTCA
judgment.

Engel's second line of attack may be more promising in
purely surface terms--although as the following in-depth analysis
reveals, that surface promise is merely specious.  Engel argues
that when Judge Kennelly entered judgment on the FTCA claims the
District Court had disposed of all claims against all parties, so
that the time within which to appeal the unfavorable jury verdict
(if Buchan were indeed called upon to do so) would have begun to
run.  Buchan did not file his conditional cross-appeal of the
<u>Bivens</u> verdict for nearly four months after it was returned--two
months longer than the 60 days allowed under Fed. R. App. P.
4(a)(1)(B) where the government or its employees are parties.  If
Buchan's time to appeal had begun to run on September 28, 2006
when Judge Kennelly entered the FTCA judgment, Buchan's appeal

would have been untimely.

But on September 28 Judge Kennelly had not yet disposed of all claims against all parties, because he had not yet resolved the validity of the earlier Bivens judgment in light of the FTCA's judgment bar embodied in 28 U.S.C. §2676. According to that provision, entry of the FTCA judgment constituted a "complete bar to any action by the claimant, by reason of the same subject matter," and Buchan contended that the Bivens claim constituted just such an action.

At the moment that Judge Kennelly entered the FTCA judgment, the viability of the earlier Bivens judgment was called into question. Buchan highlighted that fact on October 16, 2006 when he filed his motion to vacate the jury verdict--a motion that Judge Kennelly did not grant until December 26. Until that time the posture of the Bivens judgment remained unresolved and it was thus inappropriate for appeal. Instead all claims in the case were finally disposed of (and thus acquired finality) only on that December 26 date.

Recall that a party cannot be said to have had a "full and fair opportunity to litigate" an issue if that party had no opportunity to appeal the issue (Gray, 885 F.2d at 406)--and that is doubly so where, as in this case, Buchan had no basis for appeal. Because the jury verdict on the Bivens claim was vacated at the same moment that the FTCA judgment became final, Buchan

had no predicate for appealing that no-longer-extant <u>Bivens</u>

verdict.[11]  In short, collateral estoppel cannot apply because

under <u>Gray</u> Buchan simply cannot be said to have fully litigated

the issue to which that concept could attach.

So the prohibition against employing collateral estopped on

the basis of a vacated verdict is independently fatal to Engel's

summary judgment motion.  This Court expressed its grave doubts

on the appropriateness of giving the jury verdict on the <u>Bivens</u>

claim preclusive effect soon after this case was filed (see page

3 of its June 4, 2010 memorandum), and Engel's current

submissions have in no way dispelled that doubt.  As he concedes,

a vacated judgment does not trigger collateral estoppel

(<u>Pontarelli Limousine, Inc. v. City of Chicago</u>, 929 F.2d 339, 340

(7th Cir. 1991)(citations omitted):

> A vacated judgment has no collateral estoppel or res
> judicata effect under Illinois law (or any other law).

Nothing in this case alters that proposition.[12]

---

[11] Buchan did file a "conditional" cross-appeal to guard
against the possibility that Manning's effort to resuscitate the
<u>Bivens</u> verdict might find favor with the Court of Appeals.
Understandably that court expressly declined to reach that cross-
appeal after resolving Manning's appeal in Buchan's favor
(<u>Manning v. United States</u>, 546 F.3d at 438).

[12]  Engel's attempted reliance on <u>Ross-Berger Cos.</u> as an
exception to the just-completed analysis provides him no comfort
at all.  There our Court of Appeals had vacated only the award
of damages as excessive and had left the district court's finding
of liability undisturbed and thus a proper candidate for
collateral estoppel treatment.

**Brady** Claims Against Quid and Del Re

Engel also moves for partial summary judgment against Quid and Del Re on his <u>Brady/Newsome</u> claims, urging that the uncontroverted evidence is so overwhelming that a reasonable jury must find that Buchan and Quid violated his constitutional right to a fair trial by failing to disclose impeachment evidence related to the agreement with Mammolito (see, e.g., <u>Newsome</u>, 256 F.3d at 752-53).  That approach must fail, because a jury could reasonably conclude that Quid and Del Re did not have an agreement to pay Mammolito at the time of trial.  Quid and Del Re have repeatedly stated that they had no such agreement, and a jury could choose to trust their testimony as against Mammolito's letters requesting compensation.[13]  Just as importantly, Mammolito, Ford and Dugan have all steadfastly denied that they testified falsely or were encouraged to do so (B. St. ¶58), and a

---

[13]  Both sides complain of "self-serving" affidavits used to buttress the various motions.  Lawyers (and regrettably judges) often lump "self-serving affidavits" into the category of submissions that are insufficient to overcome summary judgment.  Not so--during the past 3-1/2 months our Court of Appeals has not just once but twice sought to drive dispositive judicial nails into the coffin of that mistaken notion (<u>Hill v. Tangherlini</u>, 724 F.3d 965, 967-68 (7th Cir. 2013) and <u>United States v. Funds in the Amount of $100,120</u>, 730 F.3d 711, 717 (7th Cir. 2013)), with <u>Hill</u>, 724 F.3d at 967 n.1 having expressly overruled no fewer than 26 of that court's own earlier cases that had suggested otherwise.  But old habits (particularly bad ones) die hard, and counsel here and elsewhere would be well advised to recognize that all relevant and probative evidence proffered by a party is "self-serving" in a real-world sense, and they should accordingly abandon that locution in favor of any legitimate attack on the materiality of such adverse evidence.

28

jury would be entitled to credit those denials.

Alternatively, a jury could conclude from the evidence that an agreement for payment to Mammolito did exist but that it was known to the prosecutors, so that it was they rather than Quid and Del Re who failed to comply with the Brady obligation (see Carvajal v. Dominguez, 542 F.3d 561, 566 (7th Cir. 2008)). Given the several possible fact-based "outs" for Quid and Del Re, Engel cannot prevail on his Brady/Newsome claims against them as a matter of law.

### Defendants' Motion on Engel's Constitutional Claims

Due Process Claims

Buchan moves for summary judgment on Engel's constitutional claim that Buchan withheld Brady evidence and denied him his due process right to a fair trial. Buchan frames that challenge as a question of law, arguing that he had no duty to disclose impeachment material in the prosecutor's possession, so that he claims the mantle of qualified immunity.

Buchan's legal argument on that premise is sound: Where a prosecutor knows of Brady evidence, it is his or her duty rather than that of the law enforcement officer to share that evidence with the defense (see, e.g., Giglio v. United States, 405 U.S. 150, 154 (1972); Carvajal, 542 F.3d at 566). Buchan might also be immune if he reasonably believed the prosecutor had received the Mammolito letter or was otherwise aware of the arrangement

with Mammolito (see <u>Kelly v. Curtis</u>, 21 F.3d 1544, 1552 (11th Cir. 1994)).

But that legal analysis is beside the point here. Even Engel concedes that "everyone agrees that Buchan would enjoy qualified immunity...if nothing was withheld from the prosecutor" (E. R.Mem. 63). Here the issue is not one of law but of fact, because Engel's basic contention is that the prosecution never possessed the <u>Brady</u> evidence. And qualified immunity will not protect law enforcement officials who knowingly fail to disclose <u>Brady</u> evidence to both prosecutors and defense counsel (see <u>Steidl v. Fermon</u>, 494 F.3d 623, 632-33 (7th Cir. 2007)).

Engel does not merely allege that Buchan failed to highlight evidence in the prosecutor's possession--he presents evidence that Buchan intentionally <u>withheld</u> information from prosecutors. As Engel repeatedly points out, the Missouri prosecutors deny knowledge of the agreement, and they claim that if Buchan and Quid had made such an agreement it was withheld from them (see E. Add. St. 130-33). Gabbert also stated that if he had been aware of such an agreement he would have notified defense counsel and would have made a record that his office would not reimburse Mammolito's expenses (E. St. ¶129). And Engel's defense attorney testified that he reviewed the prosecutor's files and that the Mammolito letter was not included in the files at that time (<u>id</u>. at 133).

Buchan can point to contrary evidence--most notably, the facts that Mammolito wrote to Gabbert about the asserted deal and that the Gabbert Letter was stamped "received by the Clay County Prosecutor's Office April 16, 1991" (B. Stat. ¶60). Buchan can also point to moments in Mammolito's deposition in which he seems to imply that his agreement was with prosecutors rather than investigators.

Each side thus marshals significant evidence, and the question is one of weighing the credibility of each side's assembled support. That is not of course a court's role on summary judgment. As Washington v. Haupert, 481 F.3d 543, 550 (7th Cir. 2007) has quoted from Payne, 337 F.3d at 770:

> On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.

Thus, while Buchan may ultimately prevail at trial by convincing a jury that Gabbert knew of the agreement or possessed the relevant documents, he cannot prevail on summary judgment.

Buchan also contends that he is entitled to summary judgment because he himself did not know of any agreement with Mammolito. That line of attack as a matter of law is surprising, given that the Manning jury rejected precisely that argument when confronted with the parties' factual submissions (see Manning v. Miller, 2005 WL 3078048, at *6 (N.D. Ill. Nov. 15, 2005)). In upholding that jury's verdict Judge Kennelly explicitly held that "[t]he

31

jury properly could infer...that Quid would not have made a deal with Mammolito without letting Buchan in on it" (<u>Manning v. Miller</u>, 2005 WL 3078048, at *10 (N.D. Ill. Nov. 15)).

While neither the jury verdict nor Judge Kennelly's ruling is binding on this Court, they confirm (at the very least) that a reasonable jury could find that Buchan was aware of the agreement.  Among other evidentiary matters, Engel can point to numerous statements by those involved in the investigation that Buchan was intimately involved in the Missouri kidnapping prosecution, dedicated significant energy to catching Manning and worked closely with Quid throughout the investigation and prosecution of both Engel and Manning.  Hence a jury (in that instance the <u>Manning</u> jury) could thus reasonably determine that Quid would not have made a deal with Mammolito without informing Buchan.

Again viewing the evidentiary record in the light most favorable to Engel, a jury here could also reasonably conclude that prosecutors induced Dugan to lie and concealed that information from prosecutors and Engel's counsel. Upon commencing the interview with Dugan, Quid quickly learned that she bore considerable animosity towards her ex-husband.  So a jury could reasonably find that Quid took advantage of that animosity to raise the issue of kidnappings--a suggestion that Dugan accepted with alacrity.  It could also reasonably find that Dugan

"remembered" the diamond ring only after being told of its existence by Quid and shown a sketch of the ring and could also find that discrepancies in the ring's description and in other respects rendered suspect her then handing over a similar-looking piece of jewelry.

As Judge Kennelly observed, there is evidence to support "a reasonable inference that Buchan exploited, and perhaps created, a motive for Dugan to falsely implicate Manning," and that a jury would be "entitled to believe that Buchan fed [Dugan] her information" (Manning v. Miller, 2005 WL 3078048, at *10 (N.D. Ill. Nov 14)). Finally, a jury could reasonably conclude that Buchan and Quid intentionally violated FBI protocol in putting together the photo lineup for Hildenbrand in an effort to induce a false identification of Manning.[14]

Buchan insists that there can be no genuine issues of material fact here because all of the relevant witnesses deny being involved in the fabrication of testimony or evidence. But

---

[14] Defendants justifiably object to reliance on the Heldenbrand testimony, noting that Heldenbrand did not testify at Engel's trial and that her identification was not introduced. Engel appears to concede that the improper identification procedure, standing alone, could not support his claim of a due process violation ("[B]ecause neither Heldenbrand nor Dye testified at Engel's trial, Defendants are correct that due process is not directly implicated by this misconduct" (E. R.Mem. 32-33)). But Engel's denial-of-due-process claim survives on the alleged Brady violations, and the investigators' alleged misconduct in the identification procedures remains relevant background evidence in support of a claimed attempt to "frame" Engel in an attempt to capture Manning.

in a conspiracy case the testimony of co-conspirators is not necessary to succeed at trial. Merely showing that the alleged conspirators have committed acts that "raise the inference of mutual understanding" and that "are unlikely to have been undertaken without an agreement" may allow a factfinder to infer the existence of a conspiracy (Amundsen v. Chicago Park Dist., 218 F.3d 712, 718 (7th Cir. 2000)).

Here Engel is able to marshal a great deal of circumstantial evidence of a constitutional violation, including the shifting stories of various witnesses, strong motivation to lie both on behalf of the witnesses and the investigators, and of course the Mammolito letters.  In this case, as in Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), "the sequence of events created a substantial enough possibility of a conspiracy to allow [the plaintiff] to proceed to trial, especially given the fact that the non-circumstantial evidence of the conspiracy could only come from adverse witnesses."  In sum, Engel's constitutional claims against Buchan survive.

Evidentiary Issues Raised by Quid and Del Re

That same analysis applies equally to Quid's and Del Re's motion for summary judgment. But those two defendants also raise a significant evidentiary issue that must be dealt with.  They insist that Engel's key evidence against them--the Mammolito deposition and Mammolito's 1992 letter to Quid--are inadmissible

hearsay (Mammolito has since died).  Without that evidence
Engel's case would be weakened considerably and might perhaps not
survive summary judgment.

Engel responds by arguing that the evidence is admissible
under the "predecessor in interest" exception of Fed. R. Evid.
804(b)(1), as well as the "equivalent circumstantial guarantees
of trustworthiness" exception of Fed. R. Evid. 807.  Hence each
of those provisions calls for discussion (the latter just
briefly).

To invoke Fed. R. Evid. 804(b)(1), Engel must show that the
testimony is being offered against a party "whose predecessor in
interest had an opportunity and similar motive to develop it by
direct, cross-, or redirect examination."  At the time of
Mammolito's deposition, Quid and Del Re had been voluntarily
dismissed out of the <u>Manning</u> litigation.  So the question becomes
whether Buchan and Miller, who were present at the deposition,
were Quid's "predecessor[s] in interest" and had a "similar
motive to develop" Quid's testimony. Quid argues that Buchan had
no incentive to disprove the existence of an agreement between
Mammolito and Quid (as opposed to one between Mammolito and
Buchan), so that Buchan cannot be said to have had a "similar
motive" to develop Mammolito's testimony.

<u>United States v. Feldman</u>, 761 F.2d 380, 385 (7th Cir. 1985)
has held that circumstances or factors that influence motive-to-

develop-testimony include:

> (1) the type of proceeding in which the testimony is given,
> (2) trial strategy, (3) the potential penalties or financial
> stakes, and (4) the number of issues and parties.

Each of those factors either weighs in favor of admission or is
neutral here.

Clearly the first factor supports Engel:  the testimony was
given in a federal civil rights action, which is the same type of
proceeding as the present case.  Each of the other factors
requires further analysis, but in the end they support Engel
rather than defendants.

As to the second factor, Quid rightly points out that the
parties who deposed Mammolito in <u>Manning</u> did not cross-examine
him closely as to the existence of a deal with Buffalo Grove.
Instead Buchan's counsel focused his energy on proving that
Buchan never learned of any such agreement, regardless of its
existence.  Nonetheless Buchan had every motive to question the
basic existence of an agreement, for that would have prevented a
finding of liability against Buchan. And indeed Buchan argued in
his closing both that the evidence showed there was no promise to
pay Mammolito and that Quid's version of the story regarding the
alleged agreement was the truth (E. Ex. 45). While if Quid had
remained a defendant in the trial his counsel might have focused
more heavily on the nonexistence of an agreement, Buchan cannot
be said to have pursued a significantly different trial strategy.

Hence the second factor--a closer call--does not weigh strongly in favor of either party.

As to the third factor, it like the first weighs in favor of Engel. Here the potential financial stakes are really similar to those in the <u>Manning</u> litigation--if anything, the stakes here are likely smaller, as there are fewer allegations of misconduct than in the earlier litigation.

And finally the numbers of issues and parties are also very similar. Although <u>Manning</u> included a few parties (such as Miller) and issues (such as the Hildenbrand identification) not present here, the basic contours of the two lawsuits are very much alike.

Thus the four-factor test calls for admission of the Mammolito evidence here. That outcome accords with the plain language of Fed. R. Evid. 804(b)(1), under which the question is not whether Buchan pursued the same line of questioning as Quid would have done, but whether they had a "similar motive." And Buchan had ample motivation in <u>Manning</u> to disprove the existence of any illicit deal between Quid and Mammolito. In fact, at trial Buchan attempted to do precisely that, telling the jury that "Bob Quid went in and talked to Mammolito and told him...I don't have authority to promise you anything," and that "[w]hat you would probably find is there wasn't any agreement" (E. Ex. 45).

Quid may be correct that Buchan might well have interrogated Mammolito more fully. But such an essentially tactical difference in approach does not necessarily indicate--let alone equate to--a difference in motive. In fact Engel provides several reasons as to why an in-depth interrogation might have been ill advised (E. Combined R. 26-27). Though these are entirely speculative, and Quid might have assessed the situation differently, again such tactical differences do not suggest dissimilar motives. As United States v. McClellan, 868 F.2d 210, 215 (7th Cir. 1989) has said, "the emphasis in this inquiry is upon the motive underlying the cross-examination rather than the actual exchange that took place."

Quid cites United States v. Feldman, 761 F.2d at 385 for the proposition that courts may examine the actual pattern of questioning to show that no similar motive existed. But in Feldman our Court of Appeals focused primarily on the fact that the questioner had a lesser stake in the proceedings than the criminal defendant against whom the deposition was eventually used, and the court noted that "no one at the...deposition had the requisite stake in the proceedings that would be necessary for them to be deemed a predecessor in interest" (id. at 387).

Here Buchan had as significant a stake in the Manning proceedings as Quid has in the current case, and Buchan would have benefitted immensely from demonstrating that Mammolito had

no deal with Quid or Del Re.  This Court holds that regardless of the actual exchange that took place, Buchan's motives were sufficiently similar to call for the admission of Mammolito's deposition in this case.

Quid also argues that Fed. R. Evid. 804(b)(1) contains a privity requirement, such that a "predecessor in interest" must stand in a privity relationship to the party against whom testimony is to be admitted, as well as having similar motives to develop a witness' testimony.  That notion conflicts with the decision of several Courts of Appeals, as well as decisions of other judges in this District Court (see, e.g., Dykes v. Raymark Indus., Inc., 801 F.2d 810, 816 (6th Cir. 1986); Lloyd v. Am. Exp. Lines, Inc., 580 F.2d 1179, 1185 (3d Cir. 1978); Erickson v. Baxter Healthcare, Inc., No. 99 C 0426, 2001 WL 36275328, at *16 (N.D. Ill. Sept. 28)(collecting cases)).  In that respect Supermarket of Marlinton, Inc., v. Meadow Gold Dairies, Inc., 71 F.3d 119, 128 (4th Cir. 1995)(internal quotation marks and brackets omitted) is representative:

> [P]rivity is not the gravamen of the Rule 804(b)(1) analysis. Instead, the party against whom the testimony is offered must point up distinctions in the case not evident in the earlier litigation that would preclude similar motives of witnesses examination.

As Quid repeatedly emphasizes, those out-of-circuit decisions do not bind this Court--but neither does the sole decision that Quid cites for the claimed existence of a privity

requirement (<u>Acme Printing Ink Co. v. Menard, Inc</u>., 812 F. Supp. 1498, 1525-26 (E.D. Wis. 1992)). Nor does this Court find <u>Acme Printing</u> persuasive, for that decision relies heavily on the House of Representatives' amendment to Fed. R. Evid. 804(b), ignoring the judgments (1) of the Senate Judiciary Committee report that "the difference between the versions [of the Rule] is not great" (S. Rep. No. 93-12277, at 28 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7074) and (2) of the numerous earlier-cited decisions that agree in rejecting <u>Acme</u>'s narrow construction of "predecessor in interest."

Ultimately the weight of both reason and authority favor Engel. <u>Clay v. Johns-Manville Sales Corp.</u>, 722 F.2d 1289, 1295 (6th Cir. 1983) has put the matter ably:

> We believe that what has been described as "the practical and expedient view" expresses the congressional intention: "if it appears that in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination, the testimony may be received against the present party."

Under that sensible standard Buchan and Quid shared a sufficiently similar motive, and Mammolito's deposition testimony may therefore be received against Quid.[15]

---

[15] Engel's other grounds of admission--the "equivalent circumstantial guarantees of trustworthiness" language of Fed. R. Evid. 807 and an argument that the <u>Brady</u> obligation extends to evidence that comes into existence <u>after</u> conviction--are more dubious. But this opinion need not reach those issues, given its resolution of the Fed. R. Evid. 804(b)(1) question.

With the evidentiary issue disposed of, Quid's motion for summary judgment on the <u>Brady</u> claim must fail. Indeed, this Court's earlier analysis of Buchan's motion applies with equal force here. Accepting Engel's version of the facts and drawing reasonable inferences in his favor, a jury could easily and reasonably find that Quid withheld <u>Brady</u> evidence during Engel's prosecution.[16] Indeed, that is precisely the conclusion that the <u>Manning</u> jury reached and that Judge Kennelly upheld (see <u>Manning v. Miller</u>, 2005 WL 3078048, at *9 (N.D. Ill. Nov. 15)).

## Other Constitutional Claims

Quid and Del Re argue at length that Engel's claim "that his due process rights were violated through fabricated evidence or witness coercion by Quid and Del Re" cannot survive (Q. R. Mem. 11). They seem to view that contention as separate from Engel's <u>Brady</u>-based claim, while Engel treats all of his allegations as stating a single constitutional claim that he was denied his due process right to trial "in the original sense of that phrase" (<u>Newsome</u>, 256 F.3d at 752). If the two contentions in fact coalesce, the dispute is irrelevant on a motion for summary judgment, because Engel's <u>Brady</u> claim survives easily. If on the other hand the two claims are distinct, Quid and Del Re might

---

[16] Quid argues that the Mammolito agreement is not material (see Q. Mem. 8). But the proper question is whether a jury <u>could reasonably find</u> that an undisclosed financial arrangement with a key prosecution witness was material evidence. And the answer to that question is self-evidently "yes."

have a plausible argument, for they point to several Court of Appeals decisions suggesting that police are not liable under Section 1983 for fabrication of evidence if a state law malicious prosecution remedy is available.

But Dominguez v. Hendley, 545 F.3d 585, 589 (7th Cir. 2008) has also confirmed that "manipulating or tampering with identification and testimonial evidence" gives rise to a constitutional due process claim that is "more than a Fourth Amendment claim by another name." Dominguez is particularly instructive because that case--like this one--included allegations that officers withheld exculpatory evidence, used improper identification procedures and fabricated evidence.

But in all events, given the overlaps in this case among the state law claim, Engel's Bivens claim and his due process claim, any divergence in the precedents may not turn out to be particularly significant. As a practical matter, the jury in this case will be given the claims and will be entitled to make its findings. If the jury finds in favor of plaintiff, there will be ample time to decide whether the remedy should be granted in accordance with state or federal law.

To shift to the merits of a "fabrication of evidence" claim, Quid and Del Re point to considerable evidence that no witness was manipulated or evidence fabricated. But such evidence is noncontrolling in the summary judgment context where, as here,

there is also evidence that evidence <u>was</u> fabricated. Engel's evidence includes Mammolito's change of story, a missing police report that might have cast light on that change in story and the fact that Dugan altered her account to conform with the Buchan-Quid expectations. That evidence too does not control, but it is surely sufficient to defeat summary judgment.

Engel's failure-to-intervene claim also survives. Quid and Del Re attempt to frame that claim as one involving only the Heldenbrand testimony (see Q. Mem. 9). But Engel appears to press that claim as an alternative to direct liability for unlawful actions surrounding Ford, Dugan and Mammolito, as well as Heldenbrand (see E. R.Mem. 33).

Given the extensive cooperation between Quid and Buchan, a jury could reasonably find that either of them (1) knew that the testimony of Ford or Dugan had been improperly influenced and (2) had a realistic opportunity to intervene, perhaps by informing the prosecutor, even though that defendant did not himself actively cause the constitutional violation. Thus a jury could readily find in Engel's favor on the failure-to-intervene claim as to either defendant, and the claim must survive.

<u>State Law Claims</u>

Quid, Del Re and the United States also move for summary judgment on Engel's claims of malicious prosecution and civil conspiracy (in the case of the United States, a claim that

43

applies via the Federal Tort Claims Act).[17]  This Court has previously ruled that Missouri law governs those claims.

As a preliminary matter, defendants face an uphill battle where as here they seek summary judgment based on the asserted existence of probable cause. Under Missouri law, "[a]s a general rule, the defense of probable cause is a question of fact for the jury" (Signorino v. Nat'l Super Markets, Inc., 782 S.W.2d 100, 103 (Mo. Ct. App. 1989)), and our Court of Appeals has likewise said that "claims presenting the question of probable cause are generally inappropriate for disposition on summary judgment... where there is room for a difference of opinion" (Schertz v. Waupaca County, 875 F.2d 578, 582 (7th Cir. 1989)).  Nonetheless Engel will bear the heavier burden at trial, for in Missouri "[a]ctions in malicious prosecution have never been favorites of the law," and a plaintiff must provide "strict and clear proof" of all elements of the claim (Simpson v. Indopco, Inc., 18 S.W.3d 470, 473 (Mo. Ct. App. 2000)).

Under Missouri law malicious prosecution claims require proof of six elements (id.)

(1) the commencement of an earlier prosecution against the

---

[17] Under the FTCA the United States is liable "in the manner and to the same extent as a private individual under the circumstances" (28 U.S.C. §2674). While malicious prosecution is among the state torts as to which the United States does not generally waive its sovereign immunity, there is an exception for claims such as this one that arise from the acts or omissions of law enforcement officers (28 U.S.C. §2680(h)).

plaintiff; (2) the instigation of that prosecution by the defendant; (3) termination of the prosecution in favor of the plaintiff; (4) the want of probable cause for the prosecution; (5) that defendant's conduct was actuated by malice; and (6) damage to the plaintiff.

Defendants insist that Engel has failed to provide sufficient evidence as to the satisfaction of the second (instigation) and fourth (probable cause) requirements.

### 1. Instigation

As the government points out, under Missouri law a defendant will be deemed to have instigated a prosecution only where there is "some affirmative action by way of advice, encouragement, etc." (Hunter v. Karchmer, 285 S.W.2d 918, 929 (Mo. Ct. App. 1955)). No officer will be held liable for merely providing honest information to a prosecutor (see Baker v. St. Joe Minerals Corp., 744 S.W.2d 887, 889 (Mo. Ct. App. 1988)). But "liability may arise from supplying false information to the prosecuting official" (id., emphasis added), and that is precisely what Engel alleges: that Buchan, Quid and Del Re knowingly provided false information to the prosecutor.

On that score Engel cites evidence that defendants played on Dugan's antipathy towards her ex-husband, induced her to testify falsely and prodded her to find and turn over a ring that could plausibly be said to be the one described by Ford. Moreover, Engel can point to Mammolito's testimony (and particularly the change in his story as to which of the conspirators picked up the

45

ransom money) as motivated by the undisclosed deal with Quid. And Engel also calls on ample evidence that the prosecution was as a practical matter instigated and driven by Buchan and Quid, who built the kidnapping case in its entirety before handing it over to prosecutors and then continued their involvement through trials.

Cases cited by the United States are inapposite, as they discuss instances in which witnesses have merely furnished facts to prosecutors, have not withheld information and have not actively driven a prosecution forward (see, e.g., <u>Hunter</u>, 285 S.W.2d at 931). By contrast Engel identifies record evidence that all of those misdeeds occurred in this case. Nor does it matter that the witnesses repeated their stories to Missouri police officers or that prosecutors found those stories plausible. According to Engel--and more importantly, supported by sufficient evidence to be taken as true for present purposes-- those witnesses merely repeated stories that they had falsified under pressure from Buchan, Quid and Del Re. In Engel easily satisfies the instigation requirement.

2. <u>Probable Cause</u>

Engel has a more difficult time in establishing the lack of probable cause--more precisely, in showing that a reasonable factfinder, viewing the evidence in the light most favorable to Engel, could find that there was no probable cause to initiate

the prosecution.  Under Missouri law a defendant may rebut a claim of malicious prosecution by demonstrating probable cause, defined as "reasonable grounds for suspicion, supported by circumstances in evidence sufficiently strong to warrant a cautious man in his belief that the person accused is guilty of the offense charged" (Simpson, 18 S.W.3d at 474).  That belief need not be true, or even more likely true than false.  What is required instead is "a fair probability--from the perspective of a prudent and cautious law enforcement officer--that a particular offense has been committed based on the totality of the circumstances" (Southards v. Dir. of Revenue, 321 S.W.3d 458, 462 (Mo. Ct. App. 2010)).

Defendants begin by arguing that they are entitled to a presumption of probable cause based upon Gabbert's sworn complaint and the Missouri judge's finding of probable cause in a preliminary hearing. As Moad v. Pioneer Fin. Co., 496 S.W.2d 794, 798-99 (Mo. 1973) has put it:

> [I]f the charge is initiated...by a prosecuting attorney on his sworn information and belief, [that] amounts to a prima facie showing that probable cause did exist for the prosecution.

That presumption might perhaps carry the day were it not for the predicate for overcoming the presumption exemplified by Anton v. Police Ret. Sys., 925 S.W.2d 900, 905 (Mo. Ct. App. 1996):

> The prima facie showing is conclusive unless rebutted by evidence that false testimony was the basis of the charge and the falsity was discoverable upon reasonable

investigation.

Here fraud and false testimony are at the very heart of Engel's case and are supported by sufficient evidence for summary judgment purposes. And that being so, defendants are not entitled to wrap themselves in the mantle of presumptive probable cause.

Nor can the officers insulate themselves from liability for false statements by relying on a probable cause determination by a magistrate. As <u>Franks v. Delaware</u>, 438 U.S. 154, 168 (1978) has said in the search context:

> The requirement that a warrant not issue "but upon probable cause, supported by Oath or affirmation," would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile.

In the same way, if Engel is able to prove that Buchan and Quid falsified evidence and misled the magistrate, they are not entitled to a presumption of probable cause.[18]

_____

[18] Engel's conviction complicates matters somewhat. Ordinarily under Missouri law a criminal conviction conclusively establishes the existence of probable cause, but that conclusion too is rebutted "by proof that the conviction was based on fraud or false testimony" (<u>State ex rel. Police Ret. Sys. of St. Louis v. Mummert</u>, 875 S.W.2d 553, 555 (Mo. 1994)(en banc)). That is precisely what Engel has alleged, and as already said in this opinion he has tendered enough evidence for that proposition to withstand summary judgment. Furthermore, despite Quid's and Del Re's arguments to the contrary, Engel's conviction has no preclusive effect. That conviction was vacated in Engel's habeas proceeding, and this opinion has already addressed at length the impact of a vacatur. It is likewise irrelevant that the Missouri Supreme Court, in granting habeas relief to Engel, stated that the evidence at Engel's trial was sufficient to convict (<u>State ex</u>

With the legally required adjunct of reasonable inferences,
a jury could reasonably find (as a jury did in fact find) that
Buchan, Quid and Del Re worked together to induce Dugan to
implicate Manning and fed her information to enable her to do so
(Manning, 2005 WL 3078048, at *10).  It could relatedly find that
Dugan knowingly lied at Engel's preliminary hearing in order to
implicate her ex-husband.  Even so, however, the question
remains:  Without the testimony of Dugan and Mammolito's
identification of Engel, did probable cause nonetheless exist?

Recall that Ford and Harris also testified at Engel's
preliminary hearing.  Though they described the kidnapping in
some detail, neither ever saw the faces of their assailants. And
though their accounts in some ways mirrored (and thus
corroborated) that of Mammolito, they really provided no direct
testimony linking Engel or Manning to the crime.

There is one arguable exception--Ford's missing ring, which
remains the strongest potential link between Engel and the
kidnapping.  But here too a jury could reasonably find that Ford
was initially told about the ring rather than bringing it up
himself (as he at one point testified in his deposition).  Or it
could find that investigators went to Dugan and told her of the

---

rel. Engel v. Dormire, 304 S.W.3d at 129).  That a jury could
credit the prosecution's evidence, however, has no bearing on the
different question of whether a jury could find that enough
evidence was falsified to negate probable cause.

ring, after which she "coincidentally" happened to remember that she had not only seen such a ring but had previously stolen it from Engel. Although Ford eventually identified the ring that Dugan gave to the investigators as the one he had lost, Engel notes that Ford generally said only that the ring "looked like" his, that multiple explanations were offered for the distinctive dent in the ring, and that Ford benefitted from identifying the ring by eventually being allowed to retain it.[19] At this stage (and for that matter later) the resolution of conflicting evidence is not (and will not be) this Court's function.

As an alternative the government argues that Mammolito's identification of Engel suffices to sustain a finding of probable cause (U.S. Mem. 32). But that ignores Engel's central contention that Mammolito was coached by Buchan and Quid to provide false testimony and given incentives (financial and otherwise) to do so. It would hardly be implausible for a jury to find that Quid gave Mammolito both the incentive and opportunity to fabricate testimony, including inducing him to change his story as to who picked up the ransom. And the cases that the Government musters to support the proposition that "[p]robable cause does not require that an informant be one whose reliability has been previously established" (see, e.g., <u>Missouri</u>

---

[19]    Note as well the several disparate descriptions of the ring, another factor that could shake the factfinders' reliance on that piece of evidence in the face of evidence of the asserted conspiracy submitted by Engel.

<u>v. Taylor</u>, 889 S.W.2d 124, 128 (Mo. Ct. App. 1994)) do not speak to whether probable cause may be undermined where a witness such as Mannolito evinces indicia of unreliability.

Each side has come up with more ammunition, but no useful purpose would be served by adding further detail. This is not after all a preponderance-of-the-evidence exercise. True enough, the malicious prosecution claim will be difficult for Engel to prove at trial. Under Missouri law he must show not only that Dugan lied but also that she did so knowingly (<u>Zike v. Advance Am., Cash Advance Ctrs. of Mo., Inc.</u>, 646 F.3d 504, 511 (8th Cir. 2011)). And he cannot simply rely on a jury's finding that the Missouri judge came to the wrong conclusion or should have weighed the testimony of witnesses differently (<u>id</u>.). Nonetheless Engel has provided sufficient evidence of malfeasance to enable the factfinder to determine that no prudent officer, putting aside evidence that the jury finds was false, could determine that there was a fair probability that Engel was guilty of the offense.

One final matter: As defendants appear to concede, because Engel's malicious prosecution claim has survived, his civil conspiracy claim survives as well. Thus all motions on both sides have failed--and this Court has returned to the point of beginning, a good deal wearier but uncertain whether it is any wiser.

## Conclusion

To spare this Court's courtroom deputy the chore of traversing the convoluted pathways that this opinion has had to travel, the results may be condensed into the denial of the motions designated as Dkt. Nos. 260, 264, 266 and 269. And finally, a status hearing is set for 9:15 a.m. November 21, 2013 to discuss the future course of this litigation.

_____
Milton I. Shadur
Senior United States District Judge

Date:  November 12, 2013